**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| TOUNDRA CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  1:21-cv-314-TFM-MU |
| | ) | |
| COLE & COLE, INC., | ) | |
| d/b/a THE GULF BOWL & | ) | |
| CAPTAINS CHOICE RESTAURANT | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is *Defendant's Motion for Summary Judgment and Supporting Memorandum of Law*.  Doc. 40, filed August 25, 2022.  Defendant Cole & Cole, Inc., d/b/a The Gulf Bowl and Captain's Choice Restaurant motion for entry of summary judgment in their favor as to Plaintiff Toundra Carter's claims because she cannot establish necessary elements to support a prima facie claim for hostile work environment, which, in turn, is fatal to her constructive-discharge claim.  *Id.* at 1-3.  Having considered the motion and memorandum in support, response, reply, and relevant law, the motion is **GRANTED in part and DENIED in part**.

**I.       JURISDICTION AND VENUE**

No party contests jurisdiction or venue, and the Court finds adequate support for both.  The district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(4).

The district court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district.  *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in

the forum that are related to the cause of action alleged in the complaint. . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated.    The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state.").

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to the claims in this matter occurred in this judicial district.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Gulf Bowl is a bowling alley that is located in Foley Alabama.  Doc. 40-1 at 2.  Inside of Gulf Bowl is a restaurant, Captain's Choice Restaurant.  *Id.*  Gulf Bowl and Captain's Choice Restaurant are owned by Cole and Cole, Inc. ("Cole & Cole"), the principals of which are Sonya Cole ("Cole"), her husband, and their two adult children.  *Id.*  Cole is the managing owner of Cole & Cole.  *Id.*

Plaintiff Toundra Carter ("Plaintiff" or "Carter") is a twenty-four-year-old African-American female, who was born in Foley.  Doc. 40-2 at 2.  Carter's mother is of Indian descent, and her father is of Jamaican decent.  *Id.* at 4-5.

On July 12, 2019, Carter applied for employment with Gulf Bowl, she was interviewed by Lisa Jacobson ("Jacobson"), the General Manager, who offered Carter a position as a line cook at a rate of $10.00 per hour.  *Id.* at 9, 10, 16.  Jacobson is Caucasian.  *Id.* at 28.  During the interview, Jacobson said she worked with Carter's grandmother and aunts at another restaurant, Hazel's. Doc. 44-1 at 5, 6.  Carter accepted the offer and began work at Gulf Bowl on July 16, 2019.  Doc. 40-2 at 9.  As a line cook, Carter would perform food prep, prepare the kitchen for the day, cook,

and wash dishes as needed.  Doc. 44-1 at 6.  Carter also worked the snack counter that served

walk-up customers from the bowling alley who were not seated in the restaurant.  Doc. 44-1 at 7.

At the snack counter, Carter would take customers' orders and perform point-of-sale transactions.

*Id.*  Carter's immediate supervisor was Genny Shutt ("Shutt"), the kitchen manager, who is

Caucasian.  *Id.* at 9, 11; Doc. 40-2 at 28.  Carter received her first raise of $1.00 per hour in

November 2019 and received her second raise of $2.00 per hour in May 2020 when she was

promoted to shift supervisor.  Doc. 40-2 at 19-21.  Carter understood the only people at Gulf Bowl

who could make pay or promotion decisions and could hire, discipline, and fire individuals were

Cole and Jacobson.  *Id.* at 21-23.

At all relevant times during Carter's employment with Gulf Bowl, the employee handbook

included a written anti-harassment policy that prohibited the use of harassment in any form based

on race, color, religious belief, sex, national origin, sexual orientation, age, or handicap.  Doc. 40-

4.  Carter received a copy of Gulf Bowl's employee handbook before she began her employment

and she signed an acknowledgement that confirmed she read, understood, and agreed to comply

with the policies in the handbook.  Doc. 40-2 at 25; Doc. 40-5.  The anti-harassment policy

included a procedure for employees to report harassment by a co-worker, supervisor, or agent of

the employer:

1.    Tell the alleged harasser that the behavior is offensive and unwelcome.
2.    Promptly report the facts of the incident or incidents and the names of the
      individuals involved to their immediate supervisor or, in the alternative, to
      a manager.
3.    If the immediate supervisor is the alleged harasser, the employee should talk
      with that person's supervisor about the situation.  If the employee is
      uncomfortable with approaching the alleged harasser's supervisor, then
      report the alleged harassment to the Owner.
4.    Any management representative receiving such a complaint shall promptly
      conduct as discreet and thorough an investigation as practicable.
5.    The management representative shall immediately report any incident of
      sexual harassment to the Owner.

6.     Upon completion of the investigation, the Management Representative/Owner will determine the proper course of action. If an employee complaint is found to have merit, appropriate corrective action will be taken, commensurate with the seriousness of the particular offense, up to and including termination.

7.     Even if the allegations of harassment are found to be without merit, it is a violation of this Bowling Center's guideline to retaliate against an employee for having asserted a complaint under this guideline. Where retaliation is found, appropriate corrective action shall be taken, commensurate with the seriousness of the offense, up to and including termination.

8.     Information gathered during an investigation will be held in strict confidence. Members of management will investigate and discuss a claim or harassment only with those individuals who have a need to know about it or who are able to supply necessary background information. The Gulf Bowl recognizes that whether a particular action or incident is a purely social relationship or an act of harassment requires a factual determination. The Gulf Bowl also recognizes that false accusations of sexual harassment can have serious effect on innocent employees. We expect all employees of The Gulf Bowl to act responsibly to establish a professional working environment free of harassment and discrimination.

Doc. 40-4 at 2.

Carter understood she could report violations of the anti-harassment policy to Cole, Jacobson, and Shutt, as well as Greg Pickens ("Pickens"), who is African American and was an assistant manager at Gulf Bowl. Doc. 40-2 at 28, 29.

During Carter's employment at Gulf Bowl, she alleges Edward Fortner ("Fortner"), the assistant kitchen manager at the time, made offensive comments or engaged in offensive conduct. Carter alleges she heard Fortner tell another kitchen employee a joke, the substance of which was all African Americans were on "Obamacare." *Id.* at 39-40. Carter alleges she heard Fortner say the "n-word" more than once a few times when he spoke to a co-worker, but she could not clearly hear him because he would say it at a low volume. *Id.* at 40, 72. Carter alleges she heard Fortner say "something about Jamaicans," but admits she could not quite hear what he said because he stopped talking when he noticed Carter. *Id.* at 75. Carter states Fortner was not aware of her

Jamaican heritage. *Id.* at 75. Carter did not tell Fortner she could hear the offensive statements or the statements were offensive. *Id.* at 74.

The first time when Fortner directed a racial slur at Carter was on February 8, 2020, when Fortner placed his hands over her ears then said the "n-word." *Id.* at 40-41, 48. Carter did not say anything in response to Fortner's use of the offensive word, but when he had his hands over her ears, she pushed him off then stormed away. *Id.* at 73-74. On the same date, Carter reported her incident with Fortner to Jacobson, who then met outside with Carter and Fortner to discuss the incident. *Id.* at 41, 46. Jacobson told Carter and Fortner his actions were against policies. Doc. 40-6 at 5. Fortner told Carter he did not intend to offend her and apologized. Doc. 40-2 at 47-48, 81. Jacobson states Carter and Fortner shook hands and said they could work together, so she believed the matter was resolved. Doc. 40-6 at 18.

On the same date, Jacobson called Cole to inform her about the incident between Carter and Fortner. *Id.* at 11. Carter also contacted Cole via text about the incident with Fortner and stated she wanted to discuss the matter with Cole and that she felt like she was not heard by Jacobson at the meeting. Doc. 40-2 at 48-49. Cole responded to Carter, "Okay," then texted "I just talked to [Jacobson] and we can talk Monday. She told me what was going on. We can talk Monday. So can you please keep it to yourself until then." *Id.* at 49.

Before the Monday meeting with Cole, on February 9, 2020, Carter states Jacobson approached her in the kitchen and began to yell at her, and when Jacobson left, Carter followed her and asked if they could talk, but Jacobson continued to yell. *Id.* at 50. Carter states Jacobson was upset Carter reported the Fortner incident to Cole after she believed the issue was resolved to which Carter said she felt like Jacobson "wasn't hearing me out" since Jacobson could not help her. *Id.* at 51. Carter states she then recorded her conversation with Jacobson with her phone but

did not produce the recording. *Id.* at 50. Carter states Jacobson asked if she was recording the conversation, which she denied, then Jacobson tried to take her phone but Carter retained it. *Id.* at 54-55. Carter states Jacobson said Fortner would not do anything racist because he has mixed-race grandchildren then she discussed how Carter's grandmother would not approve of Carter's behavior. *Id.* at 51. Carter states Jacobson then talked about "Obamacare" and how people like her are not able to go into an "Obamacare" office to receive assistance because African Americans take advantage of it. *Id.* Carter states Jacobson then talked about, when she worked with Carter's grandmother and aunts at Hazel's, the "n-word" was said often, but no one was offended. *Id.* at 51-52. Carter states she asked Jacobson, "So you're really going to tell me that you used those words in front of my grandmother, and my grandmother did nothing?" *Id.* at 52. Carter states, in response, Jacobson changed the subject and said Fortner is not a racist, she did not want to hear it anymore, and they had already discussed the issue. *Id.* Carter states she told Jacobson she had to have been racist since she was defending Fortner. *Id.* Carter states, during the conversation with Jacobson, Jacobson said she was acting like she was "picking cotton out of the field like I was a slave" and questioned how she could be offended by the word when she was not like her ancestors, but Carter said she reiterated she was offended by the word. *Id.* at 52-53. Carter estimates her conversation with Jacobson lasted approximately forty minutes. *Id.* at 54.

During the February 9, 2020 conversation with Carter, Jacobson states she told Carter there are "white N words" and "black N words" and she did not categorize Carter as either of them. Doc. 44-5 at 3.

After Carter's February 9, 2020 conversation with Jacobson, her and Jacobson went into an office to speak with Cole. Doc. 40-2 at 55. Carter does not specify a date when the conversation with her, Cole, and Jacobson occurred and Cole states she thought the conversation occurred on

Monday, February 10, 2020, or within one or two days of that date.  Doc. 40-1 at 15; Doc. 40-2 at 55.   During the conversation, Carter states she told Cole that Jacobson was mad Carter circumvented her and reported the Fortner incident to Cole.  Doc. 44-1 at 22.  Carter states she described to Cole the Fortner incident and told Cole about her February 9, 2020 conversation with Jacobson and how she was upset about how Jacobson handled the situation.  *Id.*  Carter states Cole and Jacobson asked her to delete the recording of her February 9, 2020 conversation with Jacobson.  *Id.*  Carter states she recorded her conversation with Cole and Jacobson, too, until Cole asked her to stop recording and delete the file at which time she stopped recording the conversation but did not delete the file.  *Id.*  Carter states Cole also said she did not want to hear the recording of the February 9, 2020 conversation with Jacobson.  *Id.*  At the conclusion of the conversation, Carter states Cole asked her and Jacobson whether the issue was resolved and if they could continue to work together to which both agreed.  Doc. 40-2 at 82-83.

Cole subsequently convened a meeting with the kitchen employees at which was discussed lingering issues, including Carter's complaint about Fortner.  Doc. 40-1 at 9-10.  Cole states Fortner apologized to Carter.  *Id.* at 10.  Cole states the discussion continued about the use of offensive language by the kitchen employees, the employees were allowed to speak about it, and after Fortner apologized, everyone agreed the problem was resolved and they could work together.  *Id.* at 10-12.  Cole states she told the kitchen employees if they needed to talk privately with her, they could stay after the meeting, but no one stayed.  *Id.* at 12.  Carter states she does not recall the meeting that Cole convened.  Doc. 40-2 at 78-80.  Carter states the only meeting she recalls occurred before the Fortner incident and the topic of the meeting was gossip but could not remember the rest.  *Id.* at 80.  Carter states the only occasion when Fortner apologized to her at a meeting was after he admonished her about how she cut certain vegetables.  *Id.*  Carter states,

between the time when she reported the Fortner incident to Jacobson and when Fortner was terminated, there were no other incidents of racially offensive comments that were uttered in her presence.  *Id.* at 86.

Cole states she subsequently required the employees to complete harassment training online in response to the Fortner incident.  Doc. 40-1 at 20; Doc. 40-2 at 124.

Before the Fortner incident, in January 2020, an employee, Sheila Williams ("Williams"), who worked at the snack bar, emailed Cole and stated she previously spoke with Cole about incidents when Fortner was intoxicated at work and how he would talk about employees to other employees, and she felt the work environment, as a result, was unpleasant.  Doc. 40-1 at 5-6; Doc. 40-10.  Williams stated there must be something Cole could do about Fortner.  Doc. 40-1 at 6. Another employee, Cameron Bosarge ("Bosarge"), and Pickens also reported to Jacobson about incidents when Fortner was intoxicated at work.  Doc. 40-6 at 4.  Jacobson reported the information from Bosarge and Pickens to Cole and Jacobson states she and Cole documented the reports.  *Id.*

On February 6, 2020, Fortner was given a final warning and placed on probation, both of which actions were summarized in a document that Fortner signed.  Doc. 40-1 at 13-14.  Fortner was terminated on February 23, 2020, for being intoxicated at work, his third such incident according to Cole.  *Id.* at 18-19.

Around the time when Fortner was terminated, Tammy Veazey ("Veazey") was hired as a fry cook at Gulf Bowl.  Doc. 44-5 at 4; Doc. 44-6 at 3.  Carter states Veazey once told Carter she would not hire Mexicans or black people to fix her car and, in April 2020, Veazey once called another employee a "Jamaican bitch."  Doc. 40-2 at 67-68.  Carter states she did not report the "Jamaican bitch" comment to anyone at Gulf Bowl.  *Id.* at 69.

On June 20, 2020, Carter and Veazey were at the fry station together.  *Id.* at 93.  Carter

states Veazey fried an order of shrimp that a server picked up to deliver but the server brought back the shrimp because they were raw. *Id.* at 94. Carter states she gave the shrimp to Veazey and told her there was a complaint that the shrimp were raw. *Id.* Carter states Veazey became upset, snatched the shrimp from her hand, then threw them back in the fryer. *Id.* Carter states Veazey threw the shrimp in the fryer with such force that it splashed grease that contacted her arm and burned it. *Id.* Carter states after she told Veazey her arm was burned, Veazey became upset then they began to argue. *Id.* Eventually, the argument between Carter and Veazey escalated to the point where the manager on duty, Bosarge, instructed both of them to clock out and leave. *Id.* at 95. Carter states she complied with Bosarge's instruction. *Id.* at 96.

That night, Carter texted Jacobson, "We quit," to which Jacobson responded, "Okay." Doc. 40-2 at 96-98; Doc. 40-11. The "we" in Carter's text also referred to her then-fiancé Brianna Eaton ("Eaton"), who also worked at Gulf Bowl and left with Carter earlier that day. Doc. 40-2 at 98. In response, Carter texted, "Fuck the bowling alley fuck all y'all racist ass cause yo ass the man [*sic*] one racist[. D]umb ass duck face ass bitch[.] Booty flat like a pan-cake ass bitch[.]" Doc. 40-2 at 98-99; Doc. 40-11. Carter states while she worked at Gulf Bowl, she performed well at her job. Doc. 40-2 at 88.

A day or so after Carter and Eaton quit Gulf Bowl, they returned to the bowling alley to bowl and eat with a few of Carter's siblings. *Id.* at 102-03. Carter states Veazey saw her then told her that she and Eaton were banned from the bowling alley. *Id.* at 103. Carter states, after she and Eaton left the bowling alley, Veazey texted her, which led to multiple responses between them. Doc. 40-2 at 106-07. Carter did not produce her text thread with Veazey until the Equal Employment Opportunity Commission ("EEOC") requested them in November 2020, and Cole states she did not see the text thread until the instant lawsuit was filed. Doc. 40-1 at 22; Doc. 40-

2 at 91.  Cole states, after she read the text thread between Carter and Veazey, she spoke with Veazey and immediately terminated Veazey because Veazey used racially offensive language and violated policy.  Doc. 40-1 at 23-24.

On November 9, 2020, the EEOC received Carter's charge of discrimination based on national origin, race, and retaliation.  Doc. 44-2 at 3-6.  Carter's charge of discrimination described certain incidents of a hostile work environment in addition to those that she described in her deposition testimony:

> 3.      I heard [Fortner] use the word "nigger" in conversation numerous times whenever he would talk about black people.  For example, I heard [Fortner] say to someone when talking about working construction, "me and my nigger friend and a Mexican used to work together.  They may be some dirty people but they sure do work hard."  I would hear [Fortner] say "nigger" on a weekly basis during the time that we worked together.
>
> . . .
>
> 5.      [Fortner] would also say things in front of me and other employees like "Trump needs to get rid of the Mexicans, foreigners, and Jamaicans.["]   [Fortner] knew I was of Jamaican heritage and knew that another black employee, Natalie, was also of Jamaican heritage when he said thing things in front of us.  [Fortner] also said "F" the Jamaicans and "Trump should build that wall and every foreigner needs to go back to where they came from."
>
> 6.      I reported Edward[']s racist behavior several times to the manager, [Jacobson].  When I told her about [Fortner] grabbing my head, [Jacobson] laughed in my face.
>
> . . .
>
> 9.      . . . [Jacobson] told me that she bet my mom was on welfare and Obamacare.
>
> . . .
>
> 11.      At some point [Cole] made me manager, but [Jacobson] also made a white employee, [Veazey], a manager over the line.  [Jacobson] did not want to promote me to manager, so she made [Veazey] a manager also, even though [Veazey] had not worked at Gulf Bowl as long as I had.
>
> 12.      . . . [Veazey] call my co-worker, Natalie a "dumb, Jamaican bitch."

13.     On May 27, 2020, I was working with Tammy on the line, when a server came back and told her to drop some shrimp.  Tammy did not hear her so I told Tammy to drop the shrimp.  When she tried to give it to the server, the shrimp was not cooked enough so I told her to cook it more.  Tammy threw the shrimp into the fryer and then threw the basket down, slinging hot grease on me and burning me.  I told her that I had been burned and Tammy called me a dumb bitch.  I tried to explain to her that I was just trying to tell her that the shrimp needed to be cooked more and Tammy said she would "never listen to a dumb, black bitch."  She then swung a tray at me.  Tammy stormed out of the kitchen and my fiancé Brianna was trying to calm her down and Tammy called her a dumb black bitch.

. . .

15.     Later that evening, I told [Jacobson] that she had gotten what she wanted and I was quitting.  I quit because of the harassing environment at work, including the racial comments, physical abuse, discriminatory treatment and being sent home while [Veazey] was allowed to stay.

*Id.* at 4-5.

**B.     Procedural Background**

On July 9, 2021, Plaintiff originally filed with this Court her Complaint against Defendant against which she brings claims for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and 42 U.S.C. § 1981: (1) hostile work environment, based on harassment due to her race (African American) and national origin (Jamaican), and (2) constructive discharge, based on theories of race harassment and retaliation.  Doc. 1.  On October 12, 2021, Defendant filed its Answer to the Complaint.  Doc. 10.

On August 25, 2022, Defendant filed its instant motion for summary judgment and memorandum in support.  Doc. 40.  Plaintiff and Defendant timely filed their respective response and reply to the motion for summary judgment.  Docs. 45, 48.  The motion for summary judgment is fully briefed and ripe for review, and the Court finds oral argument unnecessary.

## II.     STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R.

CIV. P. 56(a), (b).  Summary judgment is appropriate when the moving party establishes there is

no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter

of law.  FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258,

1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a

matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also*

*Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477

U.S. at 248, 106 S. Ct. at 2510).[1]  At the summary judgment juncture, the court does not "weigh

the evidence and determine the truth of the matter," but solely "determine[s] whether there is a

genuine issue for trial."  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  Only disputes about the

material facts will preclude the granting of summary judgment.  *Id.*

The movant bears the initial burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  A party must support its assertion that there is no

genuine issue of material fact by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations .

. . admissions, interrogatory answers, or other materials" or by "showing that the materials cited

do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1).  The admissibility of

---

[1] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to

make a showing that is sufficient to establish the existence of an element that is essential to that party's case.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

### III.    DISCUSSION AND ANALYSIS

The Court will first address Defendant's arguments as to Plaintiff's hostile-work-environment claim then its arguments as to her constructive-discharge claim.

### A.    Hostile Work Environment

Defendant argues (1) she cannot establish the fourth or fifth element of her prima facie case to show a hostile work environment, specifically the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a discriminatorily abusive working environment, and the employer is responsible for the environment under a theory of vicarious or direct liability, and (2) even if she makes out her prima facie case, the evidence does not create a genuine factual issue as to whether the alleged harassment was severe or pervasive from either an objective or subjective perspective.  Doc. 40 at 24-32.  In response, Plaintiff argues the conduct she alleges was sufficiently severe or pervasive to alter the terms and conditions of her employment.  Doc. 45 at 11-14.  Specifically, Plaintiff alleges her direct supervisor consistently used the term "nigger" in her presence in a derogatory manner when he engaged in job-related conversations with her and he constantly referred to "black folks" while he shook his head to express disbelief that he had to deal with African Americans.  *Id.*  Plaintiff alleges the same direct supervisor stated Trump needed to get rid of, among others, Jamaicans, even though he knew she was of Jamaican descent, and he said "F" Jamaicans.  *Id.*  Plaintiff further alleges, once she complained about her supervisor to her manager, she was subjected to more slurs by the manager, told African Americans abused welfare and Obamacare to the point white people could not access it, and told she acted like she was out in the field picking cotton like a slave.  *Id.*  Finally, Plaintiff

alleges she was subjected to racial slurs by a former co-worker.  *Id.*

Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

> To prove a hostile work environment claim, an employee must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  [*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)] (citation and internal quotation marks omitted).  When the employee's harassment claim is based on her race, she must prove five elements: (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for the environment under a theory of vicarious or direct liability.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

*Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018).

As to the first three elements of Plaintiff's prima facie case (none of which Defendant disputes), she belongs to a protected class based on her race, she alleges she was subjected to unwelcome harassment, among others the Fortner incident, and the harassment was based on her race because she was subjected to racially offensive slurs.  Defendant challenges whether Plaintiff can prove her prima facie case as to the fourth and fifth elements, which the Court will discuss in turn.

1.     **Whether the Harassment was Sufficiently Severe or Pervasive to Alter the Terms of her Employment and Create a Discriminatorily Abusive Working Environment**

To establish that harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment, an employee must prove that her work environment was both subjectively and objectively hostile.  *Mendoza v. Boden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc).  In other words, the employee must first establish that she "subjectively perceive[d] the environment to be abusive."  *Harris*, 510 U.S. at 21, 114 S. Ct. 367.  Then she also must satisfy the objective component by showing that her work environment was one "that a

reasonable person would find hostile or abusive." *Id.*

*Smelter*, 904 F.3d at 1285.

### a.    Subjectively Hostile

A reasonable jury could conclude Plaintiff perceived the environment to be abusive based on the fact Plaintiff complained to her manager (Jacobson) about Fortner's use of racially offensive language in front of her and was so dissatisfied with Jacobson's response to the Fortner incident , as well as Jacobson's use of racially offensive language in her response, that she reported both to the owner (Cole).

### b.    Objectively Hostile

Turning to the objective inquiry, we consider four factors when evaluating whether harassment was objectively hostile: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct reasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Although these factors help guide the inquiry, "the objective element is not subject to mathematical precision." *Bryant* [ ], 575 F.3d [at] 1297 [ ]. We must view the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010).

*Smelter*, 904 F.3d at 1285. The Court will evaluate each factor in turn.

### i.    Frequency of the Conduct

Plaintiff affirmed in her charge of discrimination she heard Fortner use the word "nigger" on a weekly basis during the time when they worked together. Doc. 44-2 at 4. Specific examples of hostile conduct during Plaintiff's employment at Gulf Bowl are as follows: (1) Fortner covered Plaintiff's ears and used the "n" word; (2) Fortner stated, "Trump needs to get rid of the Mexicans, foreigners, and Jamaicans;" (3) Fortner stated "F" the Jamaicans; (4) Fortner stated, "Me and my nigger friend and a Mexican used to work together. They may be some dirty people but they sure do work hard;" (5) Fortner told another kitchen employee a joke, the substance of which was all

African Americans were on "Obamacare;" (6) Jacobson told Plaintiff there are "white N words" and "black N words;" (7) Jacobson told Plaintiff she was acting like she was "picking cotton out of the field like [she] was a slave;" (8) Jacobson told Plaintiff people like her could not access an "Obamacare" office to receive assistance because African Americans take advantage of it, (9) Jacobson told Plaintiff, when she worked with Plaintiff's grandmother and aunts at Hazel's, the "n-word" was said often, but no one was offended, (10) Veazey once told Plaintiff she would not hire Mexicans or black people to fix her car, (11) in April 2020, Veazey once called another employee a "Jamaican bitch," and (12) on June 20, 2020, Veazey said she would "never listen to a dumb, black bitch" and referred to another employee as a "dumb black bitch." A date for when many of the hostile incidents occurred is not given, so the Court is unable to accurately calculate a frequency for how often hostile incidents occurred.

Defendant argues Plaintiff's evidence of hostile conduct is not sufficiently frequent based on cases it cites. Doc. 40 at 25-28. Defendant juxtaposes cases where the objective standard was met when hostile conduct occurred multiple times daily and daily with cases where the standard was not met when the conduct was isolated over extended periods of time. *Id.* at 26-27. Here, Plaintiff testified she heard racially offensive language weekly during her employment at Gulf Bowl as well as described specific instances of the use of racially offensive language. Therefore, the Court finds there is sufficient evidence that shows frequent hostile conduct.

### ii.    Severity of the Conduct

The Eleventh Circuit has stated "the use of the slur 'nigger' is severe," and distinguished its use when it is directed toward someone. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1255 (11th Cir. 2014). The Eleventh Circuit has found even a one-time use of the word "nigger" established sufficient severity as a matter of law. *Smelter*, 904 F.3d at 1286 ("Southern Home

argues that Smallwood's 'one-time use' of ['nigger'] was insufficient to establish severity as a matter of law.  We strongly disagree."); *see also Adams*, 754 F.3d at 1255 (finding a supervisor's isolated act severe when he carved the slur "porch monkeys" into aluminum in the plaintiff's presence).

While Defendant argues Plaintiff could not either subjectively or objectively find offensive the use of the word "nigger" because she used the same racially offensive language, including the slang term "nigga," the deliberate use of the slur "nigger" by Fortner and Jacobson, both of whom are Caucasian, presents a power dynamic that evokes the reason why the slur is in fact offensive. Doc. 40, at 28-29.  It is a slur that is used to demean and belittle a person because of their race.

In sum, viewing the evidence in a light that is most favorable to Plaintiff, the Court finds there is sufficient evidence of severe conduct.

### iii.   Whether the Conduct is Physically Threatening or Humiliating, or a Mere Offensive Utterance

The Court finds a reasonable juror could find humiliating the incidents when Fortner placed his hands over Plaintiff's ears then said the "n-word" and when Jacobson used the same slur when she spoke to Plaintiff.  Doc. 40-2 at 40-41, 48.  *See Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 848 (11th Cir. 2017) ("Here, two of Cooler's supervisors used the severe slur 'nigger' in an attempt to get a reaction out of him.  A reasonable person could perceive their intent was to humiliate Cooler.").

### iv.   Whether the Conduct Reasonably Interferes With the Employee's Job Performance

There is little evidence that shows Plaintiff's job performance was interfered with by the racially offensive conduct.  Plaintiff testified, while she worked at Gulf Bowl, she performed well

at her job, and she received multiple raises and was promoted to shift supervisor during her employment.  Doc. 40-2 at 19-21, 88.

In sum, Plaintiff has met three out of the four factors that show her work environment was one that a reasonable person would find hostile or abusive.  Therefore, the Court finds the evidence, cumulatively and in the totality of the circumstances, is enough for a reasonable person to find the offensive conduct was severe or pervasive enough to create an abusive work environment.

### 2.      Whether the Employer is Responsible for the Environment Under a Theory of Vicarious or Direct Liability

Under Title VII, an employer's liability for such harassment may depend on the status of the harasser.  If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a "supervisor," however, different rules apply.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.  [*Faragher v. Boca Raton*, 524 U.S. 775,] 807, 118 S. Ct. 2275[, 141 L. Ed. 2d 662 (1998)]; [*Burlington Indus., Inc. v.*] *Ellerth*, [524 U.S. 742,] 765, 118 S. Ct. 2257[, 141 L. Ed. 2d 633 (1998)].

. . .

[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits.  *Ellerth*[, 524 U.S.] at 761, 118 S. Ct. 2257. . . .

[T]he framework set out in *Ellerth* and *Faragher* presupposes a clear distinction between supervisors and co-workers.  Those decisions contemplate a unitary category of supervisors, *i.e.*, those employees with the authority to make tangible employment decisions.  There is no hint in either decision that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree.  On the contrary, the *Ellerth/Faragher* framework is one under which supervisory status can usually be readily determined, generally by written documentation.

*Vance v. Ball St. Univ.*, 570 U.S. 421, 424, 431-32, 133 S. Ct. 2434, 2439, 186 L. Ed. 2d 565 (2013).

Here, the only individuals at Gulf Bowl who could make tangible employment decisions were Cole and Jacobson.  Plaintiff alleges harassing behavior by Jacobson, a supervisor, and Fortner and Veazey, co-workers, so the Court will analyze whether Defendant's response to each of their actions subjects it to liability under the different standards for a co-worker and supervisor.

**a.**     **Co-Worker**

"When . . . the perpetrator of the harassment is not the plaintiff's supervisor, the employer will be held directly liable only if it knew or should have known of the harassing conduct but failed to take prompt remedial action."  *Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1287 (11th Cir. 2018) (citing *Miller*, 277 F.3d at 1278).  "An employee can demonstrate that an employer knew about the harassment by showing that she complained to management about it."  *Id.* (citing *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982).  "An employee can also show that the company should have known about harassment that was so pervasive as to create an inference of constructive knowledge."  *Id.* (citing *Henson*, 682 F.2d at 905).  However, "an employer is insulated from [harassment] liability based on constructive knowledge '[w]hen the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress.'"  *Id.* (quoting *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997)).

> To avoid liability for an employee's harassment, an employer must take prompt remedial action upon learning about the harassment.  [*Id.*] (citing *Henson*, 682 F.2d at 905).  Because that action "must be 'reasonably likely to prevent the misconduct from recurring,'" *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (quoting *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990)), we look to the effectiveness of the company's action in preventing the recurrence of the harassment it knew about.

Page 20 of 28

*Wilcox*, 892 F.3d at 1288.  This analysis can be divided into two elements, (1) notice and (2) remedial action.

### 1.      Notice

Defendant cannot be liable for harassment under a theory of constructive knowledge since it is undisputed, at all relevant times during Plaintiff's employment with Gulf Bowl, the employee handbook included a written anti-harassment policy, she received a copy of the policy in her employee handbook before she began her employment, she signed an acknowledgement that confirmed she read, understood, and agreed to comply with the policies in the handbook, and she acknowledged those at Gulf Bowl to whom she could report violations of the anti-harassment policy.  Doc. 40-2 at 25, 28, 29; Doc. 40-4; Doc. 40-5.

The Court will not analyze Veazey's racial harassment of Plaintiff via text because it occurred after Plaintiff quit her employment with Gulf Bowl and Defendant was not made aware of the texts between them until the instant action was filed.  Doc. 40-1 at 22.  As for Veazey's racial comment about how she would not hire Mexicans or black people to fix her car and when she called another employee a "Jamaican bitch," neither of those incidents were reported to management or uttered in the presence of a manager.  Doc. 40-2 at 67-68, 69.  During Plaintiff and Veazey's argument that occurred at the fry station on June 20, 2020, Veazey used racially offensive language and Plaintiff, in her charge of discrimination, stated she reported what occurred to the manager on duty, Bosarge.  Doc. 44-2 at 5.  While not specific as to whether the racially offensive language was reported to Bosarge by Plaintiff, viewing the evidence in a light that is most favorable to Plaintiff, Bosarge was informed about it.

As for Fortner's racial harassment of Plaintiff, the only such incident that was reported to Defendant was when Plaintiff told Jacobson, on February 8, 2020, how Fortner placed his hands

over her ears then said the "n-word," which Jacobson and Plaintiff later reported to Cole. *Id.* at 40-41, 46, 48-49; Doc. 40-6 at 11. There is no evidence that shows there were other complaints of racial harassment by Fortner that were brought to management's attention or racially offensive language that was uttered in the presence of management.

### 2.      Remedial Action

As to Veazey's use of racially offensive language during her argument with Plaintiff on June 20, 2020, Bosarge directed Plaintiff and Veazey to clock out then leave, but further remedial action did not occur since Plaintiff resigned later that day. Doc. 40-2 at 95. The Court cannot determine as a matter of law Defendant's remedial action in response to Veazey's harassment was effective since Plaintiff resigned on the same day when the reported harassment occurred.

As to the Fortner incident, Defendant took several different steps to address the situation: (1) on the day of the incident, Jacobson convened Plaintiff and Fortner, told Fortner his actions were against company policies, then Fortner apologized to Plaintiff and they agreed they could continue to work together; (2) Cole convened a meeting with the kitchen employees at which the Fortner incident was discussed, Fortner apologized again to Plaintiff, Cole discussed the use of offensive language, and the employees agreed they could work together; and (3) Cole required the employees to complete harassment training online. Doc. 40-1 at 9-12, 20; Doc. 40-2 at 41, 46-48, 81, 124; Doc. 40-6 at 5, 18. After the Fortner incident, Plaintiff did not experience any further racially offensive comments from Fortner. Doc. 40-2 at 86. However, the Court, again, cannot determine as a matter of law the remedial actions that Defendant took were effective since Fortner was fired for unrelated reasons within fifteen days of the incident.

Therefore, a reasonable jury could draw inferences which may result in a finding of liability for Fortner and Veazey's harassment.

b.      **Supervisor**

Plaintiff does not argue, and there is no allegation, she experienced a tangible employment action as a result of Jacobson's alleged harassment and the Court finds there was none.  *See Vance*, 570 U.S. at 424, 133 S. Ct. at 2439 ("If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."); *Ellerth*, 524 U.S. at 761, 118 S. Ct. 2257 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  Therefore, to escape liability, Defendant must prove its affirmative defense and show (1) it exercised reasonable care to prevent and correct the harassing behavior and (2) the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that Defendant provided.  *Vance*, 570 U.S. at 424, 431-32, 133 S. Ct. 2439.  "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements."  *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted).

> [A]s to the first part of the first element of the *Faragher/Ellerth* affirmative defense, an employer does not always have to show that it has a formal [anti-]harassment policy to meet its burden of proof on this element.  *See Lissau v. S. Food. Serv.*, 159 F.3d 177, 183 (4th Cir. 1998) (recognizing that small employers may show that they exercised reasonable care to prevent and correct sexual harassment through more informal complaint mechanisms).  At the same time, an employer's showing that it has a [anti-]harassment policy does not automatically satisfy its burden.  *See, e.g., Faragher*, 524 U.S. at 808, 118 S. Ct. 2275 (denying an employer the affirmative defense because although it had a sexual harassment policy it had "entirely failed to disseminate [that] policy").  As to the second part of the first element of the *Faragher/Ellerth* affirmative defense, an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint.  *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1302 (11th Cir. 2000).
>
> As to the second element of the defense, an employer's showing that the plaintiff-employee failed to follow its complaint procedures will often be sufficient to satisfy its burden.  *See, e.g., Madray*, 208 F.3d at 1302 (explaining that amorphous

complaints to persons not authorized to accept complaints constituted evidence that the employee unreasonably failed to take advantage of her employer's complaint procedures); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1365 (11th Cir. 1999) (same). However, in some cases, the proof will show that the employee's non-compliance was reasonable under the circumstances and, in these cases, the defendant cannot satisfy the second element of the affirmative defense.

*Id.* at 1313-14.

### 1.    Whether Employer Exercised Reasonable Care to Prevent and Correct the Harassing Behavior

As to whether Defendant exercised reasonable care to prevent the harassing behavior, at all relevant times during Plaintiff's employment with Gulf Bowl, the employee handbook included a written anti-harassment policy, she received a copy of the policy in her employee handbook before she began her employment, she signed an acknowledgement that confirmed she read, understood, and agreed to comply with the policies in the handbook, and she acknowledged those at Gulf Bowl to whom she could report violations of the anti-harassment policy. Doc. 40-2 at 25, 28, 29; Doc. 40-4; Doc. 40-5. There is no evidence before the Court that either Gulf Bowl supervisors or managers did not adhere to the anti-harassment policy.

As to whether Defendant exercised reasonable care to correct the harassing behavior, Defendant took several different steps to address the situation: (1) within a few days of the Fortner incident, Cole convened a meeting with Plaintiff and Jacobson, albeit for the original purpose to discuss the Fortner incident, and Plaintiff told Cole about how Jacobson discussed the Fortner incident with her but, at the end of the meeting, they agreed they could continue to work together; (2) Cole convened a meeting with the kitchen employees at which Cole discussed the use of offensive language, and the employees agreed they could work together; and (3) Cole required the employees to complete harassment training online. Doc. 40-1 at 9-12, 20; Doc. 40-2 at 41, 46, 55, 82-83, 124; Doc. 40-6 at 5; Doc. 44-1 at 22. Ultimately, Plaintiff did not experience any further

racially offensive comments from Jacobson after their conversation and until Plaintiff resigned. Therefore, Defendants has met its burden to show it exercised reasonable care to prevent and correct Jacobson's harassing behavior, so the Court moves to the second requirement that Defendant must show to prove its affirmative defense.

> 2.   **Plaintiff Unreasonably Failed to Take Advantage of the Preventive or Corrective Opportunities that Defendant Provided**

Defendant argues, after the meeting that Cole convened with the kitchen employees to discuss the use of offensive language, Plaintiff did not avail herself of Cole's invitation to discuss any grievances in private and Plaintiff did not report additional concerns about harassment during the remainder of her employment.  Doc. 48-1 at 14-15.  The evidence shows Plaintiff followed Gulf Bowl's anti-harassment procedure in that she told Jacobson she was offended by the use of the racially offensive language, she promptly reported the alleged harassment to Cole and participated with Jacobson during a meeting, and Plaintiff, according to Cole, attended the meeting with the kitchen employees.  Doc. 40-1 at 9-10, 15; Doc. 40-2 at 53; Doc. 40-4 at 2.  The Court does not believe, and a reasonable jury could not find, Plaintiff was required to again meet in private with Cole after the previous discussions about Plaintiff's grievance and the fact that she did not later report other incidents of harassment does not negate her compliance with the anti-harassment policy as to her encounter with Jacobson.  Therefore, viewing the evidence in a light that is most favorable to Plaintiff, Defendant has not met its burden to show Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that Defendant provided and its affirmative defense fails.

**B.   Constructive Discharge**

As to Plaintiff's constructive-discharge claim, Defendant argues she fails to produce

evidence to support her hostile-work-environment claim, which is fatal to her constructive-discharge claim, and even if she could establish the elements of her hostile-work-environment claim, she fails to show her working conditions were so intolerable a reasonable person in her position would have resigned.  Doc. 40 at 32-34.  As to Plaintiff's constructive-discharge claim, based on retaliation against her, Defendant argues her claim fails for the same reasons her constructive-discharge claim fails and the two alleged adverse actions against her are not, as a matter of law, adverse employment actions.  *Id.* at 34-35.  Plaintiff argues she was subjected to treatment that meets the criteria to prove a racially hostile work environment because she was harassed, complained, harassed when she complained, then harassed after complaining.  Doc. 45 at 19-20.  Plaintiff argues she was compelled to resign after a co-worker caused an altercation, used a racial slur, and was hostile toward her.  *Id.* at 20.

> The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders,* 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).  When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge. *Id.,* at 142–143, 124 S. Ct. 2342.

*Green v. Brennan*, 578 U.S. 547, 555, 136 S. Ct. 1769, 1776–77, 195 L. Ed. 2d 44 (2016).  A constructive discharge claim "is no different from a claim that an employer actually discharged an employee," thus, it has "two basic elements: discrimination and discharge."  *Id.* at 555-56, 136 S. Ct. at 1777.  Therefore, a plaintiff must prove "that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and "he must also show that he actually resigned."  *Id.* at 555, 136 S. Ct. at 1777 (citing *Pa. State Police*, 542 U.S. at 141, 124 S. Ct. 2342).  "In determining whether a reasonable person would be compelled to resign, courts consider the amount of time between the objectionable acts and the

constructive discharge, with a longer gap cutting against reasonableness." *Moore v. San Carlos Park Fire Prot. & Rescue*, 808 F. App'x 789, 798 (11th Cir. 2020) (per curiam) (citations omitted). "Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009).

Here, Plaintiff resigned her employment with Gulf Bowl on June 20, 2020.  Doc. 40-2 at 96-98; Doc. 40-11.  Plaintiff testified, after the meeting with Cole and Jacobson, which was in February 2020, she did not experience any further racially offensive comments from Fortner and did not experience further such comments from Jacobson.  Doc. 40-1 at 15; Doc. 40-2 at 55, 86. Afterward, the only other incidents of racial harassment were when Veazey stated she would not hire Mexicans or black people to fix her car, Veazey  called another employee a "Jamaican bitch," and Veazey used racially offensive language when she and Plaintiff argued at the fry station on the day when Plaintiff resigned.  Doc. 40-2 at 67-68; Doc. 44-2 at 5.  Plaintiff argues she was compelled to resign after her altercation with Veazey at the fry station.  Doc. 45 at 19-20. However, the Court found Veazey's conduct did not create liability for Defendant under a hostile-work-environment claim, let alone meet the heightened standard to prove a constructive-discharge claim.  As to Veazey's the comments about how she would not hire Mexicans or black people to fix her car and another employee was a "Jamaican bitch," Plaintiff did not comply with the anti-harassment policy since she neither told Veazey the comments were offensive nor reported, the comments.  *See Wilcox*, 892 F.3d at 1287 (citations omitted).  Further, when Plaintiff did presumably put Defendant on notice of Veazey's comments from their argument, Plaintiff did not give Defendant adequate time to remedy the situation before she resigned on the same day.  "A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir.

1996).  Therefore, Plaintiff has not met her burden to prove her constructive-discharge claim, and summary judgment is granted as to that claim.

## IV.   CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (Doc. 61) is **GRANTED in part and DENIED in part**.  The motion is **GRANTED** as to Plaintiff's constructive-discharge claim, which is **DISMISSED with prejudice**, and the motion is **DENIED** as to Plaintiff's hostile-work-environment claim.  Although the Court found Defendant is not liable for either Fortner or Veazey's harassing behavior, evidence of such may be used at trial to prove her hostile-work-environment claim.

**DONE** and **ORDERED** this 10th day of February 2023.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE